UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RYAN J. PENNELL

    Plaintiff,

v

JAMES F. GRADY II,
in his individual capacity,

    Defendant.

Case No.
Hon:

James K. Fett (P39461)
Fett & Fields, P.C.
1186 Sarah Rd.
Pinckney, MI 48169
734-954-0100
Fax: 734-954-0762
jim@fettlaw.com
Attorneys for Plaintiff

# COMPLAINT AND JURY DEMAND

## NATURE OF CLAIM

1. This is a *42 U.S.C. §1983, §1981* and *Elliott-Larsen Civil Rights Act* ("ELCRA") action for damages.

## JURISDICTION AND PARTIES

2. Plaintiff invokes the jurisdiction of this Court pursuant to *28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4), and 28 U.S.C. §1367*.

3. Defendant James F. Grady II resides in Wayne County in the Eastern District of Michigan.

4. Plaintiff is a White male, a citizen of the United States and the State of Michigan; he retired as a Lieutenant Colonel in the Michigan State Police ("MSP") in June 2025.

5. Defendant Grady is a Colonel and the Director of the MSP; he is sued in his individual capacity for money damages under *42 USC §§ 1983* and *1981* as well as *ELCRA*.

6. As a Lt. Colonel, Plaintiff reported directly to Defendant Grady.

7. The Defendant MSP is the state's premier law enforcement agency; it is a para-military organization.

8. The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

## OVERVIEW

9. "Diversity" is a laudable goal in college admissions, employment and many other aspects of life – as long as it is done legally.

10. MSP's Diversity, Equity and Inclusion Officer has correctly observed that Diversity "… cannot happen overnight and that if it does happen overnight, it's probably illegal."

11. To achieve "diversity" overnight (and to please the Governor), Defendant Grady has taken all the short-cuts imaginable to achieve "diversity" in the MSP and in the process has run roughshod over the rights of White MSP members.

## FACTS

12. This Complaint is supported by two MSP Internal Affairs investigations and the statements of the former MSP Diversity, Equity & Inclusion Officer and numerous former MSP high-ranking members that reported directly to Defendant Grady.

### *Diversity by Any Means Necessary*

13. The MSP has struggled mightily to achieve what it now calls "diversity," i.e., equalizing the percentage of minorities in the MSP *workforce* with their percentage in the *population*, which is unconstitutional. *Middleton v. City of Flint,* 92 F3d 396, 406 (6th Cir. 1996) (That is ". . .[I]t is permissible to remedy

3

*discrimination.* It is not permissible to remedy *disparity* without more. . .") (emphasis in origin).

14. Governor Gretchen E. Whitmer took office on January 1, 2019, and appointed Joseph Gasper as Director with the mandate to increase the percentages of minorities and women in the agency, even though this could be accomplished only by trammeling the rights of White male applicants and long-serving White male promotional candidates.

15. Colonel Gasper on February 6, 2019, convened a Director's Meeting at MSP headquarters where he:

   a. announced that the number one priority of the agency would be increasing the number of minorities and females in the agency; and

   b. stated that "diversity" was to be achieved at all levels of the MSP through the recruiting and promotional processes and the "Department can't look like the 80% [White male] that the Department looks like now. We need to look at that smaller number and increase it."

16. At the Spring Director's Meeting on May 13, 2019, Gasper again emphasized that the number one priority for the agency was increasing the number of minorities and females and spoke at length about the importance of diversifying all ranks of the MSP.

17. At the MSP Fall Forum on October 8, 2019, Gasper again reiterated how the number one priority in the Department was increasing the agency's number of minorities and females.

18. Gasper also spoke at length about how the MSP is "way too White and way too male;" he then declared that the MSP was to set aside 25% of the positions within the MSP for minorities and 20% for females; Gasper testified that he said something to this effect.

19. Gasper was known to ignore merit and rely exclusively on race in his promotional decisions, and he expected his leadership team to do the same.

20. Coming from the top official of a para-military organization, Gasper's directives carried much weight; when the Director speaks, people listen.

21. Nonetheless, despite shortcuts, Gasper was unable to meet Governor Whitmer's expectations of matching the MSP workplace demographics with the population race and gender demographics.

22. When Gasper retired, Governor Whitmer in September 2023 appointed Defendant Grady as the Colonel and Director of the MSP.

23. Governor Whitmer tasked Defendant Grady with diversifying the MSP where his predecessor, Gasper, failed.

24. Defendant Grady has enthusiastically embraced his mission to diversify the MSP.

25. On October 20, 2023, Defendant Grady informed Plaintiff that Governor Whitmer had directed him to "diversify" the leadership team.

26. During post visits with Plaintiff on November 6-8, 2023, Defendant

5

Grady again repeatedly raised "diversity" to Plaintiff and Major Chris Hawkins, stating that the Governor had directed Gasper to diversify the MSP, that Gasper failed and that now he was directed to succeed where Gasper failed.

27. Defendant Grady stated on multiple other occasions that Governor Whitmer directed him to diversify the MSP and that he "was going to do it."

28. On December 13, 2023, Defendant Grady stated that he was going to diversify the leadership team but that "it would be nothing personal" towards Plaintiff.

### *Re-Definition of "Diversity"*

29. Defendant Grady has re-defined "MSP diversity," telling Plaintiff that "diversity is race, it is black and white, and we've had a race problem in the nation and MSP forever."

30. Defendant Grady's observation is curious since the MSP has conceded in other litigation that it achieved representation of minorities and females in its workforce which exceeded their representation (percentage) in the relevant qualified workforce in the early 90s; moreover, there have been 3 Black Directors as well as an Hispanic and female Director in the recent past.

6

### *The Illegal Means to Achieve Diversity*

31. Applying his vision of "diversity," Defendant Grady is bent on "diversifying" the MSP overnight even though the relevant qualified work force is inadequate to achieve this goal now or in the foreseeable future.

32. Consequently, he has resorted to subverting Civil Service Rules by:

    a. Informing his leadership team that, contrary to Civil Service Rules, he, not interview panels, would be hand-picking his Captains.

    b. Holding a position open until his pre-selected Black candidate could be promoted to the position.

    c. Coercing interview panels into promoting the lowest preforming applicant so that he could promote a Black MSP member to that applicant's lieutenant position.

    d. Constituting an interview panel of subservient allies who would concur in selecting his pre-selected candidate.

    e. Creating vacancies for the sole purpose of filling them with Black MSP personnel.

33. In October 2023, Defendant Grady bullied lieutenant colonels Beth Clark and Michael Krumm on an interview panel into selecting Lt. Tim Olson for Captain of the Training Division so that he could fill Olson's vacant lieutenant position with Black male Tedric Gibbs.

34. Inspector Sarah Krebs was Clark and Krumm's number one choice for the position.

35. Plaintiff confronted Defendant Grady about the decision, who

responded that he had already been confronted by Lt. Col. Mike Krumm and confirmed that he did not care that Olson was not the top candidate because it allowed him to backfill Olson's position with the "correct candidate", Black member Tedric Gibbs.

36. On December 27, 2023, Plaintiff met with a Black female candidate, Beyonka Swain-Mills, an 11-level employee at that time, to provide her information for an upcoming 16-level community engagement position interview.

37. Swain-Mills indicated to Plaintiff that Defendant Grady had already told her she had been selected for the position but that she needed to be prepared for the interview.

38. Swain-Mills was awarded the position, despite being previously screened out for a 13-level position.

39. Speaking of anticipated vacancies, Grady on December 28, 2023, informed Plaintiff that he had plans for Black MSP members Keyonn Whitfield (who was promoted over White male Insp. Morris), Lt. Yvonne Brantley (to whom he had promised the Second District Captain position) and Lt. Dave Stokes.

40. However, Brantley was forced to retire in disgrace when it was revealed that she was providing interview questions to favored promotional candidates before the interviews; the scandal resulted in embarrassing press coverage and litigation by unsuccessful promotional candidates.

41. Grady interfered in the subsequent Internal Affairs investigation of Brantley.

42. Defendant Grady and Brantley continued to communicate even after Internal Affairs advised Brantley not to communicate with the Command staff.

43. Defendant Grady later lied about inappropriately communicating with Brantley, but Internal Affairs refused to investigate.

44. After Brantley was allowed to retire with full benefits in lieu of termination, Defendant Grady stated to Plaintiff on multiple occasions that he had promised Brantley the Second District Captain position as part of his efforts to diversify the MSP and was disappointed she had to retire.

45. In or around January 2024, Defendant Grady created a new Communications Section position.

46. Plaintiff inquired about the position in the hopes that several members would have the opportunity to be promoted.

47. Defendant Grady rebuffed Plaintiff, indicating that the new position would be filled with a candidate that would "diversify" the Communications Section.

48. Indeed, Defendant Grady opened the position to outside candidates, and a "diverse" hire was made; The employee has since been terminated.

49. On March 1, 2024, the Captain Position for the Commercial Vehicle Enforcement Division ("CVED") opened; this would be another opportunity for

9

Defendant to "diversify" the MSP.

### *Grady Informed that his Means are Illegal and Subjecting MSP to Liability but could Care Less*

50. In June 2024, Defendant Grady's Diversity, Equity and Inclusion Officer, Insp. Sarah Krebs told Defendant that "I won't support him if he is trying to manipulate the civil service processes to diversify the agency, as I think it is unfair and possibly illegal (hiring by race/gender)."

51. Krebs expressed her serious concern to Defendant Grady that his delay in filling the CVED captain position was subjecting the MSP to legal liability; that position was eventually awarded to a woefully unqualified Black Lieutenant over White male Inspector Patrick Morris, universally considered to be the most qualified candidate to fill the position.

52. Defendant Grady was unfazed by Krebs' concerns and thereafter ignored and marginalized her and stripped her of staff and resources; her opinions and advice were no longer welcome.

53. Defendant Grady's unabashed abuse of power (albeit for "diversity") inspired members of MSP's Commander Officers Association in May of 2025 to request an internal affairs investigation into Defendant Grady's October 2023 Civil Service Rules manipulation and promotion of Lt. Tim Olson to Training Division Captain for the sole purpose of promoting Black member Tedric Gibbs to Olson's

Lieutenant position.

54. In the investigation, 5 current and former Leadership Team members (3 Majors and 2 Lt. Colonels) and Insp. Krebs confirmed Defendant Grady's circumvention of Civil Service Rules, yet the Governor's Office continues to support Grady; this is hardly surprising since that Office has sanctioned his "by any means necessary" approach all along.

### Governor's Office Sanctions "By Any (Illegal) Means Necessary"

55. Defendant Grady is aided in his blatant discrimination by the Governor's Office, specifically, Chief Equity and Inclusion Officer Poppy Hernandez.

56. In August 2024, when Krebs informed her of Defendant Grady's constitutional and statutory civil rights violations, Hernandez responded: "he can do that" and "that every other director in the state does that too …. The Governor put him there to do exactly that. To diversify our agency" and "you need to support him in doing that" … "he's gonna do what he was instructed to do, and you better support him doing it."

57. In October 2024, Hernandez advised Krebs that "when she [Hernandez] went to the Governor's office she had to "'re-learn' her sense of right and wrong" and that Krebs had to learn "what's right is to make your boss successful no matter

11

what."

### *Grady Double Promotes Unqualified Candidate to CVED Captain*

58.     In November 2024, Defendant Grady and complicit interview panel members Aimee Brimacombe and Lt. Col. Sosinski awarded the CVED Captain position to Whitfield, over Inspector Morris who had 30 years in the CVED and had been the acting-Captain since March; Defendant Grady pre-selected Whitfield despite his troubling disciplinary record, complete lack of qualifications and zero commercial vehicle enforcement experience.

59.     Whitfield's disciplinary history included a "counseling memo" for a homophobic rant at a Post meeting and lying about it to internal affairs; had a white Post Commander done the same thing he would have been fired or at least demoted.

60.     Whitfield's disciplinary record continued to grow after his promotion, including sustained charges of creating a hostile work environment, incompetence in supervisory role, unauthorized disclosure of internal affairs investigation information with a third party, utilization of department vehicle for personal use, including transportation of children and use of department issued iPad for personal use and installation of "unauthorized applications" on said iPad; he also failed to complete the MSU leadership course for command officers known as "The School

12

of Staff and Command."

### *Defendant Grady's Retaliation against Plaintiff*

61. From the very beginning, and often during Defendant Grady's frequent diversity pronouncements, Plaintiff made it clear to Defendant Grady that he would not acquiesce in his illegal diversification efforts and insisted on selection, not pre-selection, of promotional candidates based on merit and in compliance with Civil Service Rules.

62. Defendant Grady is known to be very vindictive, and Plaintiff soon felt his wrath.

63. Defendant excluded Plaintiff from interview panels that he chaired as well as other panels interviewing applicants for leadership level positions.

64. Defendant Grady and Chief Deputy Director, Lt. Col. Aimee Brimacomb, his second in command, embarked on a campaign of retaliation aimed at forcing Plaintiff to retire.

65. Plaintiff was segregated in the office, ignored, excluded from meetings, constantly second guessed, and publicly chastised.

66. Yet despite Defendant Grady's and Brimacomb's campaign of retaliation, Plaintiff performed in exemplary fashion.

67. Nevertheless, on March 24, 2024, Defendant Grady and Brimacomb

informed Plaintiff that his contract would not be renewed.

68.     Defendant Grady and Brimacomb further stated that Plaintiff would be demoted to a Sergeant position, a demotion Human Resource Director Stephanie Horton stated was unprecedented in her 23+ year career.

69.     Plaintiff inquired about the Sergeant position and why the demotion was so drastic.

70.     Defendant Grady refused to explain, stating he wanted to let the demotion "sink in."

71.     Defendant Grady further stated that Plaintiff would be eligible to apply to for higher ranking positions, but that "You will be a sergeant, and I have already identified the sergeant position you will be in."

72.     Defendant Grady further stated "this was not personal or performance" related.

73.     Following the meeting, HR Director Horton relayed that she had informed Defendant Grady that Plaintiff could be placed in any position at any rank, but that Defendant Grady was not interested.

74.     On March 19, 2024, Plaintiff applied for three Lt. Colonel positions.

75.     On March 20, 2024, a Departmental Analyst was told to post two of the Lt. Colonel positions on Indeed because they were not getting "enough of the correct

14

[Black] applicants."

76. On March 28, 2024, Plaintiff interviewed for the Lt. Colonel position.

77. The last question Defendant Grady asked during the interview was "What does diversity mean to you?"

78. Plaintiff gave a broad (and wrong) definition of diversity that included race, socioeconomic status, geography and upbringing.

79. Defendant Grady grew visibly upset and chastised Plaintiff, stating that "diversity is only race."

80. Plaintiff did not get the position.

81. Although Defendant Grady informed Plaintiff that he would be demoted to Sergeant, for some unknown reason he was demoted to Lieutenant on April 3, 2024.

82. However, due to Defendant Grady's inability to attract enough "correct candidates," he had little choice but to place Plaintiff in a Lieutenant Colonel position, which he did on April 14, 2024.

83. However, Defendant Grady and Brimacombe continued to isolate, ostracize and belittle Plaintiff in the presence of colleagues and subordinates.

84. The working conditions caused Plaintiff to suffer stress-related issues which caused Plaintiff difficulty in his work and home life.

85. Plaintiff was off work from June 5, 2024, until April 9, 2025, because

15

of an injury sustained while responding to a critical incident in his neighborhood.

### *Constructive Discharge*

86. When he returned to duty, he again was subject to constant negativity from Defendant Grady and Brimacombe.

87. Defendant Grady told Plaintiff to "come back, sit in my office, and don't make any decisions."

88. Defendant Grady altered Plaintiff's duties on a weekly and sometimes daily basis based on light-duty return to work status.

89. Plaintiff was generally not allowed to attend meetings or run his Bureau; when he was allowed to attend meetings, Defendant Grady ridiculed and embarrassed Plaintiff in the presence of peers and subordinates.

90. By June of 2025, Plaintiff knew that the only way to work his way back into Defendant Grady's good graces was to participate in Grady's illegal diversification efforts, which he was not going to do.

91. He also knew that continued employment would be acquiescence and alone could subject him to criminal and civil liability.

92. Consequently, felt compelled to resign, which he did on June 27, 2025.

### COUNT I - 42 USC §1981 RETALIATION
### (Through 42 USC § 1983)

93. Plaintiff incorporates by reference each of the preceding paragraphs.

94. Plaintiff engaged in protected activity under 42 USC § 1981 by

opposing Defendant Grady's racial discrimination against members of the MSP.

95. Defendant Grady, who is known to be vindictive, retaliated against Plaintiff as described above because he opposed Grady's racial discrimination against MSP members.

96. Defendant Grady's retaliation is consistent with his pattern and practice of retaliating against MSP members that disagrees with him.

97. Plaintiff retired on June 27, 2025 because of Defendant Grady's retaliation and continuing, systematic discrimination against MSP members in violation of the State and Federal Constitutions and State and Federal civil rights statutes.

98. Plaintiff's retirement was a reasonably foreseeable consequence of Defendant Grady's retaliation and continuing, systematic discrimination because continued MSP employment could subject him to criminal and civil liability under *42 USC §§ 1985-1986* and *18 USC § 241*.

99. Defendant Gasper's constructive discharge of Plaintiff violates *42 USC § 1981*.

100. As a proximate result of Defendant Grady's illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of

17

these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendant Grady in his personal capacity for:

a. Economic damages

b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, because of Defendant's illegal actions;

c. Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988;

d. Such other equitable relief as the Court deems just.

## COUNT II - ELCRA RETALIATION

101. Plaintiff incorporates by reference each of the preceding paragraphs.

102. Plaintiff engaged in protected activity under ELCRA by opposing Defendant Grady's racial discrimination against members of the MSP.

103. Defendant Grady, who is known to be vindictive, retaliated against Plaintiff as described above because he opposed Grady's racial discrimination against MSP members.

104. Defendant Grady's retaliation is consistent with his pattern and practice of retaliating against MSP members that disagree with him.

105. Plaintiff retired on June 27, 2025 because of Defendant Grady's retaliation and continuing, systematic discrimination against MSP members in

violation of the State and Federal Constitutions and State and Federal civil rights statutes.

106.   Plaintiff's retirement was a reasonably foreseeable consequence of Defendant Grady's retaliation and continuing, systematic discrimination because continued MSP employment could subject him to criminal and civil liability under *42 USC §§ 1985-1986* and *18 USC § 241*.

107.   Defendant Grady's constructive discharge of Plaintiff violates *ELCRA MCLA 37.2701*

108.   As a proximate result of Defendant Grady's illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendant Grady in his personal capacity for:

a. Economic damages

b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, because of Defendant's illegal actions;

c. Costs, interest and reasonable attorney fees as provided by *MCLA 37.280*.

d. Such other equitable relief as the Court deems just.

Respectfully submitted,

Dated: December 8, 2025

/s/ James K. Fett
By: James K. Fett (P39461)

## JURY DEMAND

Plaintiff through counsel demands trial by jury.

Respectfully submitted,

Dated: December 8, 2025

/s/ James K. Fett
By: James K. Fett (P39461)